UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


JENNIFER WALKER, )
 )
 Plaintiff, )
 )
vs. ) Case No. 2:07CV0053 AGF
 )
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
 )
 Defendant. )

## MEMORANDUM AND ORDER

This is Plaintiff Jennifer Walker's second request for review of an adverse

decision by the Commissioner of Social Security denying her application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, U.S.C.

§§ 1381-1383f.  For the reasons set forth below, the decision of the Commissioner shall

be affirmed.

## PROCEDURAL SUMMARY

Plaintiff, who was born on October 17, 1981, and had never engaged in substantial

gainful activity, filed an application for SSI on October 2, 2001, at the age of 20.  On

June 11, 2002, an Administrative Law Judge ("ALJ") found that Plaintiff was not

disabled, and there was no further appeal.  Plaintiff's current application for SSI was filed

on October 28, 2002, at the age of 21.  She claimed a disability onset date of October 17,

1981 (her birth date) due to cyclic vomiting syndrome ("CVS").  After this application

was denied at the initial administrative level, Plaintiff requested an evidentiary hearing and one was held before a different ALJ (the "Second ALJ"), on April 29, 2004, at which Plaintiff, her mother, and a vocational expert ("VE") testified.  By decision dated July 2, 2004, the Second ALJ found that Plaintiff was not disabled.  After the Appeals Council of the Social Security Administration denied Plaintiff's request for review, she turned to the Court for judicial review of the Second ALJ's decision.

Plaintiff argued that the Second ALJ committed reversible error in applying a rebuttable presumption of continuing nondisability arising from the prior determination that Plaintiff was not disabled, a presumption recognized by the Ninth Circuit, but not by the Eighth Circuit.  Plaintiff also argued that the Second ALJ's decision was not supported by substantial evidence in the record.  Specifically, Plaintiff argued that in assessing Plaintiff's residual functional capacity ("RFC"), the Second ALJ did not consider limitations Plaintiff had due to her CVS and mental impairments, did not consider recent evidence from Plaintiff's treating physician, and did not explain the credibility to be accorded the testimony of Plaintiff's mother.  By Order dated February 2, 2007, the Court reversed and remanded the case to the Commissioner for application of the proper legal standard, absent the presumption of continuing nondisability; for reexamination of the record with regard to Plaintiff's anxiety and depression; and for consideration of Plaintiff's mental and physical impairments in combination, paying attention to whether they met the requirements of  the deemed-disabling mental impairment listed in the Commissioner's regulations at 20 C.F.R., Part 404, Subpart P,

Appendix 1, Listing 12.05(C).  Walker v. Barnhart, No. 2:06CV0008 ERW/AGF (E.D. Mo. Feb. 2, 2007).

A new evidentiary hearing was held on June 28, 2007, before a third ALJ (hereinafter the "ALJ"), who on July 20, 2007, found that Plaintiff was not disabled.  The Appeals Council declined jurisdiction, making the ALJ's decision of July 20, 2007 (the "2007 Decision") the final agency action now subject to judicial review.

## RECORD BEFORE THE COURT

### Medical Evidence from April 1999 through December 2003

So that this Memorandum and Order is complete, the Court will recount the medical evidence as set forth in Case No. 2:06CV0008.  The Transcript references remain the same.  To the Medical Evidence discussed in the prior Opinion, the Court adds only the following related to Plaintiff's IQ testing at age 16:  On April 28, 1998, when Plaintiff was 16½ years old, she scored a verbal IQ of 81, a performance IQ of 74, and a full scale IQ of 76 on the Wechsler Intelligence Scale for Children-Third Edition ("WISC-III").  Tr. at 286.

On April 15, 1999, Plaintiff, who was then 17½ years old, scored a verbal IQ of 79, a performance IQ of 68, and a full scale IQ of 73 on the Wechsler Adult Intelligence Scale-Revised ("WAIS-R").[1]  Tr. at 126.  A report completed on September 15, 2000, at

_____

[1]    The WAIS-R classifies an IQ score of 69 as mentally retarded; scores within the 70-79 range as borderline; scores within the 80-89 range as low average; and scores within the 90-109 range as average.  Under the Commissioner's listings of deemed-disabling
(continued...)

the beginning of Plaintiff's senior year in high school, noted a diagnosis of learning disability with intellectual and cognitive ability within the borderline range, basic reading skills at a 6.7 grade level, reading comprehension at a 4.6 grade level, written expression skills at a 6.6 grade level, and mathematic calculations and reasoning skills at 8.9 and 7.4 grade levels, respectively. The report also noted that "on occasion" Plaintiff was absent several days in a row due to her CVS. Tr. at 98-99.

The medical record establishes that Plaintiff suffered from CVS since at least the age of 12. Some of the records before the Court predate October 2002;[2] however, these reports provide instructive background information. On January 22, 2001, Plaintiff presented to the emergency room at 1:45 p.m., complaining of nausea and vomiting that had begun at 9:00 p.m. the night before. She was given Droperidol (a tranquilizer used to reduce nausea and vomiting) intravenously and fluids and sent home in satisfactory condition. On March 8, 2001 (Thursday), Plaintiff was seen by David Armin, M.D., for nausea and vomiting that she was experiencing since that Sunday. She reported that she

---

[1](...continued)
conditions, a claimant with a verbal, performance, or full scale IQ of 59 or less is considered to be a mentally disabled. A claimant with a verbal, performance, or full scale IQ of 60 through 70 is considered disabled if she also suffers from a "physical or other mental impairment imposing an additional and significant work-related limitation of function," or at least two of the following four criteria: marked restriction of activities of daily living; marked difficulty in maintaining social functioning; marked difficulty in maintaining concentration, persistence or pace; repeated episodes of extended-duration decompensation. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05.

[2]   SSI benefits are not retroactive prior to the month in which the application is filed. 20 C.F.R. § 416.335.

had missed four days of school, which was unusual for her.  Plaintiff was told to take her medications (Prevacid, Lorazepam, and Zofran) and to try to get some sleep and take in fluids, and was sent home.  Plaintiff vomited again the next day and was seen again by Dr. Armin, who recommended the same treatment and diagnosed acute CVS, noting that Plaintiff had had this condition for years.  Tr. at 146.

On March 19, 2001, Plaintiff reported vomiting the previous evening, but feeling fine presently.  Tr. at 138.  A radiology examination conducted on March 21, 2001, showed a normal gallbladder and the results of an upper gastro-intestinal series were also normal.  Tr. at 141.  The next day, Plaintiff was admitted to the hospital for observation to see if she might need intravenous fluids.  Her attending/treating physician, David Fleisher, M.D., noted that she had had multiple admissions for vomiting.  He also noted a history of anxiety and depression for which Plaintiff had been taking  Zoloft until some weeks ago when it was stopped by an Emergency Room physician.  Tr. at 149-50.  In progress notes dated June 6, 2001, Dr. Fleisher noted that after Plaintiff was admitted to the hospital on March 22, 2001, her vomiting stopped, an IV was deferred, and she was sent home.  These notes also state that Plaintiff had been symptom-free for the past four weeks.  Tr. at 151-52.

Dr. Fleisher's notes from November 20, 2001, state that Plaintiff was seen for apathy.  She had moved out of her great-grandmother's home and was living with her mother, but continued to worry about her great-grandmother's health.  Plaintiff was noted

as being teary and she was diagnosed with anxiety/depression, as well as CVS.  It was noted that Plaintiff had not had a CVS episode for eight months.  Tr. at 155.

Plaintiff saw Dr. Fleisher again on April 10, 2002.  She reported that on April 2, 2002, she was fired from her job at a nursing home for being "too slow," and that she felt very bad about this.  Plaintiff's mother was concerned that Plaintiff's Zoloft was not working, but Plaintiff said that she was feeling better than she felt during the previous week and that Zoloft helped her.  Dr. Fleisher noted that Plaintiff had a CVS episode on March 27-28, 2002, for which she took two Ativan tablets, slept, and woke up feeling better.  He also noted that the most recent previous episode had been on June 8, 2001, nine months earlier.  Tr. at 155.

Dr. Fleisher reported that Plaintiff's mother told him that Plaintiff had been irritable and unmotivated for four months and just wanted to be with her great-grandmother, with whom Dr. Fleisher opined Plaintiff had a co-dependent relationship and who objected to Plaintiff becoming independent.  He diagnosed CVS "much improved," and anxious depression related to the poor health of her great-grandmother.  Dr. Fleisher recommended that Plaintiff pursue a job.  Tr. at 156.

On January 3, 2003, C. William Breckenridge, Psy.D., interviewed Plaintiff for a psychological evaluation in connection with the current application for benefits.  Dr. Breckenridge noted that Plaintiff's alleged impairments were GERD (gastroesophageal reflux disease ), anxiety, and a learning disability.  He mentioned that Plaintiff drove herself to the interview (on a learner's permit), accompanied by her great-grandmother.

The report noted that Plaintiff had never been hospitalized for psychiatric reasons and had never been seen for psychotherapy. Plaintiff reported that she had been on Zoloft for two years and that it had been effective. She also reported that she had had depression for the past three years, which Dr. Breckenridge noted appeared to be related to her anxiety about the health of her great-grandmother, with whom she generally lived, and to what Plaintiff would do if anything happened to her great-grandmother. Dr. Breckenridge wrote that Plaintiff was cooperative and pleasant, was "reasonably verbal," and exhibited no thought disorder. He diagnosed depressive disorder NOS (not otherwise specified), anxiety disorder NOS, and borderline intellectual functioning by history. Dr. Breckenridge assessed a Global Assessment of Functioning ("GAF") score of 65 currently, and 70 over the past year.[3] Tr. at 158-61.

Dr. Breckenridge opined that Plaintiff could experience mild symptoms of depression and anxiety when situations became stressful for her; that she appeared capable of understanding and remembering simple instructions; that her ability to sustain concentration and persistence with tasks was "typically adequate"; that her ability to interact socially and adapt to her environment might be mildly to moderately affected by

---

[3] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 41 to 50 reflect "serious" difficulties in social, occupational, or school functioning; scores of 51 to 60 indicate "moderate" difficulties in these areas; scores of 61 to 70 indicate "mild" difficulties.

her depression and anxiety at times; and that her borderline intellectual functioning would interfere with her ability to function in "more demanding" situations. Tr. at 161-62.

A physical RFC was prepared on January 8, 2003, by Ruth Martin, a senior counselor with the state disabilities agency. Ms. Martin indicated that the record established no exertional, postural, manipulative, visual, communicative, or environmental limitations. Tr. at 164-71.

On January 15, 2003, non-examining consulting psychologist Paul Stuve, Ph.D., completed a Psychiatric Review Technique form, indicating in check-box format that Plaintiff had the medically determinable impairments of learning disability/borderline intellectual functioning; depressive disorder NOS, with which she was currently doing well with medications; and anxiety disorder NOS. Dr. Stuve indicated that these disorders resulted in mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no repeated episodes of decomposition for an extended duration. He opined that Plaintiff's allegations of anxiety and a learning disability, and her reports of some difficulty with sleep and some difficulty reading directions, were generally consistent with the medical evidence in the record and were credible. Tr. at 172-84.

On the same day, Dr. Stuve also completed a mental RFC assessment indicating that Plaintiff was moderately limited in her ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities

within a schedule; maintain regular attendance; be punctual within customary tolerance; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. He wrote that the evidence in the file indicated that Plaintiff could understand and remember simple directions. Tr. at 186-88.

Emergency Room records from March 22, 2003, stated that Plaintiff presented with a complaint of nausea. She was given medication by IV and released to the care of her great-grandmother. Treatment notes by Dr. Fleisher dated March 24, 2003, noted that Plaintiff eschewed independence and that she became upset and began to retch when talking about her worries about her great-grandmother, "who in reality had been her only mother figure and had raised her." Dr. Fleisher increased Plaintiff's Zoloft and Zofran, started her on Trazadone (a sedative and anti-depressant), and advised her to keep Lorazepam and Prevacid on hand. Tr. at 203-04.

On April 21, 2003, Plaintiff presented to Dr. Fleisher with complaints of vomiting and nausea since April 11, which she would experience 15 minutes after eating, followed by an hour of pain. Plaintiff was intermittently weepy and smiling. An abdominal ultrasound revealed a contracted gall bladder, and Dr. Fleisher diagnosed CVS (quiescent), anxious depression with co-dependency with her great-grandmother; and marked increase in "functional vomiting" (frequent episodes of recurrent vomiting) and

abdominal pain, both exacerbated by the depression.  Dr. Fleisher counseled Plaintiff to

"muddle through!".  Tr. at 200-05.

Records from Dr. Fleisher dated May 28, 2003, show that since her last visit,

Plaintiff had only vomited once, three days before, although she remained anxious.  Dr.

Fleisher observed that Plaintiff was alert and shy, but happy.  Her diagnoses remained the

same and she was continued on her medications, with advice to use them to abort CVS

episodes.  Tr. at 197-98.

On December 16, 2003, Plaintiff was seen in the hospital due to uncontrolled

vomiting.  Dr. Fleisher completed a Physical Medical Source Statement on January 7,

2004.  He wrote that Plaintiff could work full time when she was well, but that episodes

of incapacitating nausea and vomiting lasting for days recurred unpredictably and

impaired her ability to obtain and keep a job.  Tr. at 191-94.

**Evidentiary Hearing of April 29, 2004**

Because the ALJ in the present case refers to and relies upon the testimony offered

at the Evidentiary hearing on April 29, 2004, the Court will review that testimony, as

presented in the former case.  Plaintiff testified to the following.  She last worked in

March of the previous year as a dietary aide.  She had trouble at that job keeping up with

her tasks of passing out food trays and filling water glasses, and was fired after three days

because she was too slow.  Her only other job was as a nurse's aide in a nursing home,

where her tasks were to push residents to the dining room table, make their beds, get them

ready for bed, and pass out ice.  Plaintiff quit this job after three months because she was

making too much money to receive Medicaid. Plaintiff could not remember in what year that was.[4] She testified that she could not currently work because she did not know when her vomiting illness might flare up. Tr. at 23-24.

Plaintiff had had a vomiting episode the previous week, and before that, in December 2003. During an episode she would vomit constantly; sometimes she could deal with it using her medications, but other times she needed to go to the hospital for an IV. She could have an episode every three or four months. When she was not sick, she could help her mother, with whom she was then living, with all household chores. During the day, Plaintiff read the newspaper and watched TV. She graduated from high school, taking a combination of regular and special education classes, and had a driver's permit, for which she had to take a written test, and hoped to get her license in a few months. Tr. at 27-29.

Plaintiff's mother testified that in addition to the vomiting episode the week before the hearing and in December 2003, Plaintiff had had another episode in January 2004. This witness further testified that Plaintiff had about eight episodes in a six-month to one year period, some requiring hospitalization and other times not. Tr. at 31.

The VE then testified that an individual of Plaintiff's age, education, and work experience who suffered from a learning disability limiting her to simple work, could not perform Plaintiff's past work as a nurse's aide, because that job, as usually performed,

---

[4] It is not entirely clear from the record just when Plaintiff worked as a nurse's aide for three months and when she worked for three days as a dietary aide.

was not simple, but semi-skilled. The VE opined, however, that the individual could perform the job as Plaintiff had described it, noting that Plaintiff indicated that she left that job voluntarily and not because she could not perform the tasks assigned to her. The VE testified that other jobs the individual could perform included any unskilled job, such as a cashier and a handpacker, both of which existed in significant numbers nationally, and in smaller numbers (1,500 and 150, respectively) regionally. Tr. at 32-34.

In response to questioning by Plaintiff's counsel, the VE testified that if the individual had episodes of incapacitating nausea and vomiting lasting "for days" and recurring unpredictably approximately eight times a year, all jobs identified would be precluded. Tr. at 34-35.

**Medical Records Submitted Following Remand**

Plaintiff saw Dr. Fleischer on April 11, 2006, at which time he prescribed Vicodin for migraine headaches. Plaintiff's CVS was in abeyance and her anxiety and depression were being controlled well with Zoloft. Plaintiff received emergency room treatment for symptoms suggestive of CVS four or five times in April and May 2006. On June 20, 2006, Dr. Fleisher noted that Plaintiff's CVS was quiescent and that her migraine headaches, anxiety, and depression had improved. Plaintiff again went to the ER on October 11, 2006, for CVS symptoms. On December 26, 2006, Plaintiff told Dr. Fleischer that she had had no further CVS episodes. On March 7, 2007, Plaintiff was hospitalized overnight for CVS-like symptoms.

The record includes an undated memo from Terry Floyd, a licensed practical nurse and mental health counselor, to whom Plaintiff had been referred by Dr. Fleischer. Nurse Floyd wrote that she was seeing Plaintiff weekly, pending an examination by a psychiatrist, and that Plaintiff was diagnosed with major depression, severe and recurrent, and generalized anxiety disorder. Tr. at 426. On March 29, 2007, Dr. Fleischer completed another Physical Medical Source Statement. He diagnosed CVS, migraine headaches, and anxiety and depression, and explained that the CVS and migraines were episodic and could be "totally incapacitating or non-existent, depending on whether or not she is having symptoms." In checkbox format, he limited Plaintiff to only occasional stooping, crouching, reaching overhead, crawling, and climbing ladders. Tr. at 409-13 .

**Evidentiary Hearing of June 28, 2008 (Tr. at 227-38)**

Plaintiff testified that she was 25 years old and was living with her mother and her one-year-old nephew, and that her only income was food stamps. Plaintiff stated that she had not worked since her previous hearing and that the main problem preventing her from working full-time was her CVS. She stated that she could have cyclic chains of vomiting five or six times every month at the most frequent, or every three to four months at the least frequent. Historically, when she was working, she would get stressed and the vomiting would start, causing her to miss three to four days of work. At times when the stress in her life was lower, such as currently, her vomiting was less frequent.

Plaintiff testified that her daily activities included watching television, cleaning up her mother's house, spending about an hour with her boyfriend, walking her cat on a

13

leash, visiting her grandmother who lived five miles away, and going shopping with her

mother. Plaintiff reported that she had no friends or social attachments beyond her cat

and her boyfriend. She had a driver's license, but no car.

Plaintiff testified that her primary care physician (Dr. Fleischer) had been trying to

treat her for depression and anxiety with Zoloft, which she had been taking for seven

years, but that this was "not working anymore," and so he wanted her to see a

psychiatrist. She testified that she thought stress would bother her at a workplace and

would make her upset and sick. The stress would come from being told what to do and

not being able to follow directions and do her job as required.

Plaintiff's mother testified that Plaintiff did not always go to the doctor for her

vomiting. Plaintiff's mother essentially confirmed Plaintiff's description of the frequency

of her vomiting.

**ALJ's Decision of July 20, 2007 (Tr. at 209-19)**

The ALJ's 2007 Decision is divided into two parts. In Part I, he explained why he

believed that the Second ALJ's decision of July 2, 2004, should be affirmed even though

its "method of evaluation was somewhat unorthodox."[5] In Part II, the ALJ began a new

evaluation process beginning July 3, 2004. In Part I, the ALJ held that the Second ALJ

was correct in concluding that Plaintiff's only credible permanent restriction was that she

be restricted to simple, repetitive tasks based on her borderline intellectual functioning

---

[5]     The ALJ explained that when the Second ALJ presided over Plaintiff's case, he
was sitting as a visiting ALJ, and that his permanent station was in the Ninth Circuit.

and that her CVS never existed at a frequency that would prevent her from maintaining a normal work schedule over time.

In a footnote, the ALJ noted that Dr. Breckenridge reported that Plaintiff had borderline intellectual functioning and not mental retardation, and that there was a substantive difference between the two that had to do more with functioning than with IQ scores, citing to the preamble to Section 12.05, and further noting, "[t]he District Court's decision did not make much, if anything, of this issue. As far as the undersigned is concerned, the issue is settled. The claimant has borderline intellectual functioning and not mental retardation. A functional limitation to simple, repetitive tasks is common for borderline intellectual functioning." Tr. at 212 n3.

The ALJ found that the preponderance of the medical evidence, which was more credible than the testimony of Plaintiff and her mother, showed that the times Plaintiff would need to actually leave work due to a CVS episode "would not be all that frequent" and that "each episode, when it occurred, was always stabilized within a day or two." The ALJ continued as follows:

> The undersigned has been hearing and deciding Social Security disability cases for nearly 30 full years. He knows from listening to vocational expert testimony over the years that a claimant, to be functionally employable, typically needs a medical condition that would cause her to be absent from her job an average of two or more days a month on a consistent basis. That is not what has been established here. The CVS episodes, according to the documented medical records, are actually very infrequent and do not last all that long when they do occur.

The ALJ found that Plaintiff's anxiety and depression were also episodic and, as with the CVS episodes, never frequent or long enough to render Plaintiff unsuitable for a regular full-time job. The ALJ noted that Dr. Fleischer "never stated or suggested" that these impairments were not manageable or that "intense episodes occurred all that often." The ALJ stated that Plaintiff's basic abilities to think, understand, communicate, and get along with people were never significantly impaired on any long time basis. He noted that she was never referred for treatment to a mental health professional. The ALJ concluded that the Second ALJ correctly gave more weight to the medical records than to the subjective allegations of Plaintiff and her mother, and that the decision of July 2, 2004, should be affirmed.

The ALJ then summarized the new medical records and testimony that came into the record following the remand. He found that Plaintiff had borderline intellectual functioning, CVS, migraine headaches, and anxiety and depression controlled by medication, but that none of these impairments or combination thereof was of a severity that met or medically equaled the requirements of a deemed-disabling impairment listed in the Commissioner's regulations.

The ALJ noted that the only thing that had changed after the remand was that Plaintiff currently had a diagnosis of migraine headaches and had recently started seeing a mental health therapist. He stated that the new evidence regarding CVS episodes still showed that they were not of a frequency that would prevent Plaintiff from maintaining a regular work schedule. He found that Plaintiff's testimony at the supplemental hearing

regarding the frequency of CVS episodes was "markedly in contrast to the documented evidence" and was not credible.

The ALJ also stated that Plaintiff's testimony at the supplementary hearing indicated that she did "pretty much whatever she wants most of the time" and he found her testimony that a job would produce too much stress for her to handle "a bit disingenuous and presumptuous, insofar as she has barely even tried to work at any job." He then found that even though Plaintiff had started seeing a therapist on a weekly basis, and even assuming that Plaintiff had a very severe mood disorder currently, it would be very speculative to assume that the condition would last at a severe and uncontrollable level for 12 months. In sum, the ALJ determined that Plaintiff could perform jobs at all exertional levels, as long as the jobs did not require more than simple, repetitive tasks. He found that the testimony of Plaintiff's mother was not credible, as this witness was not medically trained, was an interested party with a financial stake in the outcome of the matter, and, most important, her testimony, like Plaintiff's, was inconsistent with the medical records.

The ALJ applied Plaintiff's vocational factors (age, education, work experience) to the Commissioner's Medical-Vocational Guidelines ("Guidelines"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, No. 204, resulting in a finding that Plaintiff was not disabled. The ALJ noted that pursuant to Social Security Ruling ("SSR") 85-15, a restriction to simple, repetitive tasks in Plaintiff's case did not preclude application of the Guidelines. He also

referred to the VE's testimony at the April 29, 2004[6] hearing that Plaintiff could perform the job of cashier or hand packager. Thus, the ALJ found that Plaintiff was not disabled.

The ALJ then found that the record did not show a marked restriction of activities of daily living; marked difficulty in maintaining social functioning; marked difficulty in maintaining concentration, persistence or pace; or repeated episodes of extended-duration decompensation. He concluded that there was no evidence that Plaintiff had a combination of mental impairments that met or equaled Listings 12.02 to 12.10.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)).

---

[6] The ALJ noted that even if the VE testimony from 2004 were considered "stale," the restriction the ALJ adopted "to simple, repetitive tasks would not preclude the application of . . . Section 204.00 to find the claimant not disabled, even without vocational expert input. Social Security Ruling 85-15."

Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

> It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo. If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioners's findings, [the court] must affirm the denial of benefits.

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 404.1520a(c)(3).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulation, 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work, if any. If the claimant can return to past relevant work, the claimant is not disabled. Otherwise, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant has the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as depression, the Commissioner cannot carry the step-five burden by relying on the Guidelines, but must consider testimony of a vocational expert ("VE") as to the availability of jobs that a

person with the claimant's profile could perform.  Baker v. Barnhart, 457 F.3d 882, 888

n.2, 894-95 (8th Cir. 2006).  Here, the ALJ decided at step five that Plaintiff was not

disabled.

## Combination of Impairments

Plaintiff argues that the ALJ did not fully consider the connection between

Plaintiff's anxiety and her CVS, as evidenced by the ALJ's statement that Plaintiff's

testimony that a job would produce too much stress for her was disingenuous and

presumptuous as she never really tried to work.  Plaintiff argues that the record

establishes that she cannot handle the stress of a full-time job without erupting into

vomiting cycles, and the fact that these cycles were not more frequent was precisely

because of her "self-limiting lifestyle that kept her stress low."  Pl. Br. 15-17 & n.12.

Plaintiff argues that the ALJ erred similarly in not considering the interplay between

Plaintiff's anxiety and borderline intellectual functioning, which caused her stress in even

unskilled work, as evidenced by the fact that she lost a job because she was too slow.

It is true that an ALJ must consider impairments in combination.  20 C.F.R.

§ 404.1523; Anderson v. Heckler, 805 F.2d 801, 805 (8th Cir. 1986).  However, if the

ALJ discusses each of the Plaintiff's impairments and concludes that they do not render

the Plaintiff disabled, no further analysis is required.  Browning v. Sullivan, 958 F.2d

817, 821 (8th Cir. 1992).  "To require a more elaborate articulation of the ALJ's thought

processes would not be reasonable."  Id.; see also Hajek v. Shalala, 30 F.3d 89, 92 (8th

Cir. 1994).  Here, the ALJ discussed Plaintiff's physical and mental impairments and

21

several times noted that his conclusions were premised on a consideration of the combination of impairments. Plaintiff points to the dietary aide job that she lost reportedly because she was too slow, but she does not mention the nurse's aide job she quit on her own after three months for reasons not related to her impairments. "Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005). The Court concludes that Plaintiff's arguments on this point are without merit.

## Listing 12.05(C)

Plaintiff's other argument is that the ALJ did not evaluate properly whether Plaintiff met Listing 12.05(C). Plaintiff asserts that in determining that she did not meet this listing, the ALJ simply looked to the label assigned by Dr. Breckenridge of "borderline intellectual functioning" rather than "mental retardation" and did not analyze the elements of the listing. Plaintiff maintains further that she meets the elements of Listing 12.05(C), with her April 1999 IQ scores (verbal IQ of 79, performance IQ of 68, and full scale IQ of 73) and the additional significant impairment of anxiety and depression and/or CVS.

The Court agrees with Plaintiff that the ALJ's analysis of whether Plaintiff met Listing 12.05(C) was cursory, especially in light of this Court's directions upon remand. Also as Plaintiff notes, to satisfy Listing 12.05(C), a formal diagnosis of mental retardation is not required. See Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). Upon review of the record, however, the Court concludes that the decision that Plaintiff

did not meet this Listing is sufficiently supported by the record. The Eighth Circuit has held that the Commissioner need not rely exclusively on IQ scores and may disregard test scores that are inconsistent with the record. See Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001); Clark v. Apfel, 141 F.3d 1253, 1255-56 (8th Cir. 1998) (holding that the ALJ properly rejected IQ scores in the mid-60s as meeting the first requirement of Listing 12.05(C) where, among other things, scores were based on a one-time examination by a non-treating psychologist and no other physician ever found that the claimant was retarded).

Here Plaintiff's IQ scores from 1998 noted above did not satisfy Listing 12.05(C). Under the Commissioner's regulations, IQ test results obtained between ages 7 and 16 should be considered current for two years when the IQ is 40 or above. 20 C.F.R. Pt. 404, App. 1 to Subpt. P, § 112. No medical source, including Dr. Breckenridge, ever opined after the 1999 IQ test, that Plaintiff was mentally retarded. Although the Court believes that this issue presents a close question, ultimately, the Court believes that the ALJ's decision that Plaintiff did not meet Listing 12.05(C) is supported by the record.[7] As stated above, "[i]f after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioners's

---

[7]    Though the Court does not rely on this fact in reaching its decision, the Court does note that Plaintiff testified before three different ALJs who were able to observe her demeanor and ability to communicate.

findings, [the court] must affirm the denial of benefits." <u>Wiese</u>, 552 F.3d at 730 (citation omitted).

<b><u>CONCLUSION</u></b>

Accordingly,

**IT IS HEREBY ORDERED** that the July 20, 2007 decision of the ALJ is

**AFFIRMED**.

An appropriate Judgment shall accompany this Memorandum and Order.


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of March, 2009.